M2 SOFTWARE, INC., Plaintiff,

v.

M2 COMMUNICATIONS, L.L.C.,
et al.   Defendant.

No.  CIV.02–1588AHM(MCX).

United States District Court,
C.D. California,
Western Division.

Aug. 1, 2003.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION**

MATZ, District Judge.

## I.

## INTRODUCTION

This matter is before the Court on cross-motions for Summary Judgment and Summary Adjudication. Defendant M2 Communications, L.L.C. ("M2 Communications") moves for Summary Judgment, arguing that no reasonable jury could conclude that there is a likelihood of confusion between Defendant's Christian music products and the music products and music business services of Plaintiff M2 Software, Inc. ("M2 Software"). On the other hand, Plaintiff moves for Summary Adjudication, arguing that no reasonable jury could *not* conclude that there is a likelihood of confusion. For the reasons provided below, Defendant's motion is GRANTED and Plaintiff's motion is DENIED. Based on the Court's rulings on the cross-motions, Defendant's motion for Summary Adjudication on the Issue of Damages is MOOT.[1]

## II.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The mov-

Toula A Arvanitis–Dalpe, Toula A Arvanitis–Dalpe Law Offices, Anaheim, CA, for plaintiff.

Anthony M Keats, Larry W McFarland, David K Caplan, Keats McFarland & Wilson, Beverly Hills, CA, Mark Hayes Wildasin, Robb S Harvey, Waller Lansden Dortch & Davis, Nashville, TN, John E McOsker, Waller Lansden Dortch & Davis, Los Angeles, CA, for defendants.

---

1. On July 29, 2003, the Court Clerk provided a draft of this Order to the parties via facsimile. The deadline to request a hearing was August 1, 2003 at 1:00 p.m. Neither party requested a hearing.

**1168**

ing party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248, 106 S.Ct. 2505. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transportation Brokerage Co., Inc. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir.2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325, 106 S.Ct. 2548. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (*citing Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

When the moving party meets its burden, the "adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as other-wise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ.P. 56(e). Summary judgment will be entered against the non-moving party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.; Beyene v. Coleman Sec. Serv., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). But the non-moving party must come forward with more than "the mere existence of a scintilla of evidence." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citation omitted).

## III.

### ANALYSIS

The facts of this case are well-known to the parties. Plaintiff's activities and products were discussed in the November 27, 2002 Order Denying Plaintiff's Motion for a Preliminary Injunction ("11/27/02 Order") and other orders issued by this Court in this case and the related cases of *M2 Software, Inc. v. Madacy Entertainment, et al.*, CV00–2853 AHM (Mcx) ("*Madacy* case") and *M2 Software, Inc. v. Viacom, Inc.*, CV98–8734 AHM (Mcx) ("*Viacom* case"), including Judge Baird's January 4, 2002 Summary Judgment Order in the *Madacy* case. Defendant's

products and activities have been discussed in the 11/27/02 Order and other orders entered in this case. Because it appears that on this motion little evidence has been presented by either party other than what was included in the Preliminary Injunction motion decided seven months ago,[2] the Court will not devote space in this order to a rehashing of the facts. Instead, the Court incorporates by reference the facts set forth in its previous orders.

Although Plaintiff alleges eight claims for relief in its First Amended Complaint, the only issue on these cross-motions is likelihood of confusion. Plaintiff has alleged claims for trademark infringement under 15 U.S.C. §§ 1114 (FAC ¶¶ 31–34), common law trademark infringement (FAC ¶¶ 48–52), false designation of origin under 15 U.S.C. § 1125 (FAC ¶¶ 35–40); trade name infringement under Bus. & Prof. § 14402 (FAC ¶¶ 41–47); common law trade name infringement (FAC ¶¶ 53–57); unfair competition under Bus. & Prof. § 17200 (FAC ¶¶ 64–66); common law unfair competition (FAC ¶¶ 58–63) and fraudulent transfer under Civ.Code § 3439.04 (FAC ¶¶ 67–76). Both parties agree that Plaintiff's trademark infringement, trade name infringement and unfair competition claims turn on the same likelihood of confusion analysis. The false designation of origin claim also turns on likelihood of confusion. *E.g. Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985). Plaintiff's fraudulent transfer claim is no longer in this case, because it recites facts pertaining only to Defendant Gaylord Entertainment, Inc., a party this Court dismissed for lack of personal jurisdiction in January 2003. 1/27/03 Order.

█ In assessing likelihood of confusion, the Court considers eight factors: (a) the strength of Plaintiff's mark; (b) the relatedness of the two companies' goods or services; (c) the similarity of the marks; (d) evidence of actual confusion; (e) the marketing channels used; (f) the degree of care likely to be exercised by purchasers; (g) the likelihood of expansion of the product lines and (h) Defendant's intent in selecting the mark. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979) ("*Sleekcraft* factors"). To prevail on Defendant's Summary Judgment motion, Plaintiff must "create a genuine issue that confusion is probable, not simply a possibility." *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir.2002) (quotation omitted).

Plaintiff believes that it has raised claims for both forward and reverse confusion; Defendant argues that the First Amended Complaint properly states claims only for forward confusion. As the Court discusses below, whether Plaintiff has properly claimed reverse confusion does not affect the outcome, because Plaintiff has not raised a genuine issue about either forward or reverse confusion.

## A. Likelihood of Forward Confusion

Plaintiff's business consists of (1) music industry database applications, including the M2 Record Label Management System (RLMS); (2) providing management services to record labels, such as management of album catalogs and sales information; (3) the website "M2MUSIC.COM," which provides digital audio and video over the internet; and (4) music content on CDs, CD–ROMs, cassettes, and the internet. 11/27/02 Order at 1–2. Items (1) and (2) are marketed within the music industry and not to the public at large. *Id.* at 2.

Defendant is an "artist-based independent Christian music company," Escamilla

---

**2.** Indeed, in both Plaintiff's Motion for Summary Adjudication and its Opposition to Defendant's Summary Judgment Motion, Plaintiff relies primarily on exhibits proffered on prior motions. *See* Plaintiff's Mot. at 1 n. 1; Plaintiff's Opp. at 2 n. 2.

Decl. in Support of Pl.'s SA Mot. ("Escamilla Decl.") Exh. 7 at 36, that distributes audio and video recordings featuring Christian music. 11/12/02 Caplan SJ Decl. Exh. 20 at 380. Defendant has jointly developed with Integrity Media, Inc., its parent company, a line of CDs and DVDs called "iWorship." The iWorship CDs include "the most popular contemporary and emerging modern Christian songs in the world." Escamilla Decl. Exh. 7 at 50. The DVDs are "designed to enhance the worshiper's experience through visuals combined with sing-along lyrics and click tracks for musicians and worship leaders." *Id.* Defendant's "M2.0" mark does not appear anywhere on the outside packaging of the iWorship double CD and DVD lodged with the Court[3] and Plaintiff has not provided any evidence that any other iWorship products or promotional materials contain the "M2.0" mark.

◼ Recognizing that the goods and services Plaintiff provides to the recording industry are different from the goods it sells to the general public, both Judge Baird and this Court have considered the *Sleekcraft* factors separately as they pertain to general consumers and the record industry.

(a) *Strength of Plaintiff's "M2" Mark*

◼ Plaintiff argues that in a trademark infringement action, the strength of a mark is determined based solely on its conceptual strength. Because "M2" is an arbitrary or fanciful term, Plaintiff argues, its mark is deemed inherently strong and the strength inquiry must end there. This is an incorrect statement of the law. "Th[e] 'strength' of [a] trademark is evaluated in terms of its conceptual strength *and commercial strength.*" *GoTo.com,*

*Inc. v. Walt Disney Company,* 202 F.3d 1199, 1207 (9th Cir.2000) (citing 2 *McCarthy on Trademarks and Unfair Competition* § 11:83 (hereinafter *"McCarthy"*)) (emphasis added). A court measures a mark's commercial strength by reference to the plaintiff's use of the mark in the marketplace. *See* 2 *McCarthy* § 11:83 ("Many arbitrary and suggestive terms may be conceptually and inherently strong, but if they receive little publicity through only meager advertising and feeble sales, they are relatively weak marks in the place where it counts: the marketplace.").

Plaintiff contends that market strength considerations occur in dilution cases only and that it would be error to consider commercial strength in this infringement case. Plaintiff is wrong. The *GoTo.com* case was not about dilution; like this case, it was a suit for infringement under section 43(a)(1) of the Lanham Act (15 U.S.C. § 1125(a)(1)). *GoTo.com,* 202 F.3d at 1204 n. 3, 1206. Similarly, the quoted section of *McCarthy* does not pertain to dilution cases specifically, but rather to the strength of a mark generally.

Plaintiff's reliance on *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133 (2d Cir.1999) is unavailing. In that case, the Second Circuit held that the district court had erred in relying on the plaintiff's lack of advertising in concluding that the plaintiff's mark was weak. The court stated that the absence of advertising "need not weaken" a mark, especially where, as in that case, the plaintiff obtained recognition by consumers without the need for advertising. *Id.* at 139. The court stated that "[w]hen a claimant has no need for traditional advertising because of the nature of its market, it should not feel compelled to advertise

---

**3.** However, Defendant's mark does appear on the last page of the booklet inside the CD packaging in which the text states that one of the songs on the album was "courtesy of

M2.0." Additionally, Defendant's "M2.0" mark appears, along with 5 other marks, for approximately one second on the DVD video. 11/18/02 Escamilla Decl. Exh. 1.

simply to protect its service mark." *Id. Morningside Group* did not hold that commercial strength is not relevant to likelihood of confusion; it held that evidence of advertising is not necessary where other indicia of commercial strength are available. *See Therma–Scan, Inc. v. Thermoscan, Inc.,* 295 F.3d 623, 632 (6th Cir.2002) (citing *Morningside Group* and stating that not "examining whether the mark is distinctive *and well-known in the general population,* would shift the focus away from the key question of whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.") (emphasis added).

The facts relating to this factor are substantially unchanged from those before the Court when it ruled on the Preliminary Injunction motion. Plaintiff's "M2" mark is arbitrary or fanciful, rendering it conceptually strong. However, the commercial strength of Plaintiff's mark among general consumers is extremely weak. The evidence of Plaintiff's marketing efforts to general consumers relating to its music CD and CD–ROM products appears to consist of a few advertisements in magazines such as *Music Connection* and *BAM*. Caplan Decl. Regarding Excerpts of Escamilla's Deposition ("Caplan Decl. I") Exh. 45 at 307–312. Plaintiff does not provide evidence that it has created or sold any new or additional CD or CD–ROM content since Judge Baird correctly found in January 2002 that Plaintiff's sales of those items were too "flabby" to warrant a finding by any reasonable trier of fact that confusion is likely. *Madacy* case 1/4/02 Order ("*Madacy* SJ") at 16. Plaintiff itself characterizes its CD and CD–ROM sales as "minuscule." Plaintiff's Opp. at 5 n. 3.

Plaintiff's evidence regarding its record industry consumers does raise a genuine issue about the strength of its mark in that arena, albeit barely. As it did at the preliminary injunction stage, Plaintiff claims vaguely to have engaged in "day-to-day advertising, promotion and marketing of its M2 mark to major record labels located in Los Angeles, Miami, Nashville, New York City and throughout the United States." M2 Software's Opp. at 5–6 (citing Escamilla Decl. in Support of Preliminary Inj. Mot. ¶ 21). Plaintiff also estimates that it has expended $2.75 million over the past ten years on promotional efforts in the music industry, including promotion of its mark at various music industry trade conferences, and on "securing and protecting its exclusive right to use the M2 mark." Caplan Decl. in Support of M2 Communications's SJ Mot. ("Caplan Decl. II") Exh. 2 at 30–31. After subtracting from that sum the $1 million Plaintiff has previously alleged were spent on enforcement efforts, *see* 11/27/02 Order at 6, (which are not sufficient to show that Plaintiff's mark is strong), that leaves about $1.75 million in unspecified and unproven expenditures over 10 years on promotion to record industry consumers.

Plaintiff proffers little evidence of actual sales of its record label management products and services. On these motions and on its motion for a preliminary injunction, Plaintiff has proffered a total of about 15 "Site Licensing" or "Royalty Processing" Agreements, most of which are redacted, in which Plaintiff provided its RLMS system or its record management services to customers. Most of the agreements provided are from 1997 or earlier. There is no evidence in the record about the number of customers Plaintiff currently has.[4]

---

4. Plaintiff claims it provided a list of customer names in its Interrogatory Responses and that Defendant omitted the relevant pages of those responses from the exhibits Defendant filed in relation to these motions. But Plaintiff inexplicably did not file the allegedly omitted customer list itself.

Indeed, there is little indication of who Plaintiff's customers are, since customer names in the contracts are in many instances redacted.

### (b) Relatedness of Products/Services

In assessing the relatedness of the parties' goods and services, the Court considers whether the relevant consumers are likely to associate M2 Communications's products with the products and services of M2 Software. *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1056 (9th Cir.1999). Whether the parties compete for an "overlapping audience" is relevant to this inquiry. *Id.* When the Court denied Plaintiff's Preliminary Injunction motion, it considered the sparse record relating to the proximity of Plaintiff's CD–ROM products and Defendant's Christian music recordings. The Court observed that Plaintiff's musical offerings, including "acid-jazz" artists, were vastly different from Defendant's Christian music offerings and that Plaintiff had provided no evidence that consumers of its CD–ROM products would overlap with Defendant's target audience. 11/27/02 Order at 8–9. *See Q Division Records, LLC v. Q Records*, 2000 WL 294875, *4 (D.Mass.) (Stating that although both parties sold musical recordings "that is not the end of the matter, since this type of classification is so broad as to be meaningless.")

The only new evidence regarding the proximity of Plaintiff's CD–ROM products favors Defendant. Defendant proffered an expert report by Bill Conine,[5] an individual with experience in the Christian music industry, who opines that Christian music is a "niche" market that is delineated by its lyrical content. Caplan Decl. II Exh. 9 at 114 (Conine Report). Conine states that two trade associations—the Gospel Music Association and the Christian Music Trade Association—assess lyrical content to determine whether a particular product ought to be classified as Christian music for purposes of tracking its sales in a database called Christian Soundscan. *Id.* at 114–15. Conine represents that Plaintiff's CDs and CD–ROMs are not listed on Christian Soundscan and opines that the Christian Music Trade Association would not consider Plaintiff's music content as Christian music. *Id.* at 115. Thus, even if Plaintiff's products were sold in a general record store, they would be sold in a separate section from Defendant's products, *id.*, and Plaintiff's products would not be sold in the Christian bookstores where Defendant's products are primarily sold. 11/27/02 Order at 3.

Plaintiff argues that the relevant issue is not whether its CD–ROM products are related to Defendant's products, but whether its RLMS and record label management services are related to Defendant's Christian music products. Plaintiff argues that the conceptual strength of its "M2" mark makes record industry consumers likely to associate M2 Communications's Christian music with M2 Software's record business services. No reasonable jury could come to that conclusion. Plaintiff's royalty processing products and services and Defendant's Christian music products are not complementary, not sold to the same class of purchasers and not similar in use or function. *See Walter v. Mattel, Inc.*, 210 F.3d 1108, 1111 (9th Cir. 2000).

Plaintiff appears to argue that members of record industry who work for Christian record labels will believe that Plaintiff and Defendant are affiliated, because Plaintiff has provided record label business services to Christian record labels. Pl.'s Mot. at 5;

---

**5.** Plaintiff did not depose Mr. Conine, did not furnish a competing expert report or consumer study, and does not address Mr. Conine's competence or credibility in any of its papers.

Pl.'s SGI ¶¶ 114, 115. Plaintiff points out that one of its Christian label customers has a distribution agreement with "Word Entertainment," which is also M2 Communications's distributor Pl. Mot. at 5 n. 2 (citing 11/18/02 Escamilla Decl. Exh. 6 at 19–21). This argument does not raise a genuine issue about a likelihood of confusion. Plaintiff has proffered absolutely no evidence to indicate that this strained, narrow and limited connection makes confusion by record industry professionals *probable*. *Cohn,* 281 F.3d at 842 (Plaintiff must "create a genuine issue that confusion is probable, not simply a possibility.") (quotation omitted). First, that a record label to whom Plaintiff provides royalty tracking services uses the same distributor as Defendant, without more, cannot raise a genuine issue that confusion is probable among record industry professionals. Second, Plaintiff has proffered no evidence to counter Defendant's expert's statement that record industry professionals understand the difference between a company that tracks royalties and a Christian record label that provides musical content. Caplan Decl. II. Exh. 9 at 117–18 (Conine Report). Third, Plaintiff does not proffer evidence to dispute Mr. Conine's expert statement that the Christian music industry is a "close-knit business where most people either personally know or know of the significant players in the business," including Jeff Moseley, Defendant's Chief Manager, *id.* at 118; 8/23/02 Moseley Decl. ¶ 1, and that "when record industry professionals deal with [Moseley] or M2 Communications, LLC, or the M2.0 ... record label[ ], they know who they are dealing with." Caplan Decl. II Exh. 9 at 118 (Conine Report).[6]

*(c) Similarity of the Marks*

The "determination of 'similarity' involves consideration of the marks and names in their entirety and as they appear in the marketplace." *Nutri/System, Inc. v. Con–Stan Indus. Inc.,* 809 F.2d 601, 605–606 (9th Cir.1987) (citation omitted). There remains a genuine issue about whether "sight, sound and meaning," *Brookfield,* 174 F.3d at 1054, of the parties' respective marks are similar enough to engender confusion.

This is the only *Sleekcraft* factor that weighs in favor of the Plaintiff.

*(d) Evidence of Actual Confusion*

Nothing has changed since the Court remarked in its Order denying Plaintiff's request for a Preliminary Injunction that "[w]hile this factor is not as important as the others ... Plaintiff has not proffered a shred of evidence of actual confusion regarding either its general or record industry consumers." 11/27/02 Order at 10.

*(e) Marketing Channels*

For the reasons provided in the Court's Order Denying Plaintiff's Motion for a Preliminary Injunction, there is simply no evidence that the parties employ the same primary marketing channels. 11/27/02 Order at 9–10. Additionally, Plaintiff's argument that this factor weighs in its favor because both parties use the Internet is unfounded. "*Some* use of the Internet for marketing ... does not alone and as a matter of law constitute overlapping marketing channels." *Entrepreneur Media, Inc. v. Smith,* 279 F.3d 1135, 1151 (9th Cir.2002). Plaintiff has not shown that it uses its website, which appears to be geared primarily to providing music and

---

6. What record industry professionals think when they deal with Plaintiff M2 Software is a reverse confusion issue. As the Court dis-

cusses *infra,* Plaintiff has not raised a genuine issue about reverse confusion either.

video content, Pl.'s Opp. at 5, as a "substantial marketing and advertising channel," *Entrepreneur Media*, 279 F.3d at 1151, for the RLMS products and label management services it provides to its record industry customers. Additionally, even if Plaintiff considers its website as a substantial marketing channel for its CD–ROM musical products, "the failure to provide *any* evidence of sales attributable to the website [*see* Caplan Decl. I at 127:1–128:17], prevents the inference that this site has created recognition of the mark or the qualities of M2 Software's product lines among the general public." *Madacy* SJ at 18.

### (f) Purchasers' Degree of Care

As for Plaintiff's CD–ROM products, the Court has already noted—and no evidence has been proffered to the contrary—that "the role of the trademark in the purchase of musical recordings is generally subordinate in a meaningful way to the purchaser's search for the artist and the composition." *Sunenblick*, 895 F.Supp. at 634. *See also Tsiolis v. Interscope Records, Inc.*, 946 F.Supp. 1344, 1356 (N.D.Ill.1996) ("[C]ustomers are motivated to purchase recordings based upon the performer, not the record label ... [and] are necessarily discriminating between musical genres."). Defendant's expert opines that, aside from "a limited number of possible exceptions," [7] Caplan Decl. Exh. 9 at 115 n. 2 (Conine Report), "it is essentially unheard of in the music business for a consumer to search for music recordings by record label." *Id.* at 115. Mr. Conine opines that general market retailers organize products by musical genre, *id.* at 114, and that Defen-

dant's Christian recordings would not be classified as the same genre as Plaintiff's CD–ROMs. *Id.* at 115.

For Plaintiff's record business products and services, Plaintiff has not provided any evidence to rebut Defendant's expert's opinion, supported by case law, that record industry professionals know the difference between a company that provides royalty tracking services and a label that provides Christian music products. Caplan Decl. II Exh. 9 at 118 (Conine Report); *Q Division Records*, 2000 WL 294875, at *5 ("[Record] industry insiders ... are presumed to be quite sophisticated."). Moreover, Plaintiff's royalty management products and services are expensive (according to a 2001 contract Plaintiff proffered, the annual fee was $17,000 for 2001 and 2002, Caplan Decl. I. at 239) and even a one-time decision to purchase Plaintiff's services creates an ongoing relationship with Plaintiff. There is no indication that a record label considering entering into a services or software licensing contract with Plaintiff lasting a year or more would not consider carefully the origin and nature of Plaintiff's services before entering into such a contract.

Plaintiff's citation to *Television Enterprise Network, Inc. v. Entertainment Network, Inc.*, 630 F.Supp. 244, 247 (D.N.J. 1986), does not alter the analysis. On a Preliminary Injunction motion in that case, the Court noted that "[d]eals [in the television business] are cut over the telephone and through signatures on form contracts. There need be no prolonged negotiations, no personal visits, no personal services." *Id.* This, Plaintiff argues, weighs against a finding that record industry professionals

---

**7.** Plaintiff challenges Conine's conclusion by *pointing out that amazon.com has a "label stores" area which lists albums by record label. The "label stores" contain only a limited number of famous labels, such as Deutsche Grammophon, Blue Note and Motown Records. It does not list Plaintiff's or Defen-* dant's labels. Plaintiff does not dispute De*fendant's expert's contention that "purchasers of Christian music recordings in particular make purchasing decisions based on the artist or the style of music, and not the record label." Caplan Decl. II Exh. 9 at 116 (Conine Report).*

display care as consumers of products or services such as those of Plaintiff or Defendant. However, there is no evidence before the Court that (a) when Defendant M2 Communications makes deals with other record labels (if it makes such deals at all), those deals involve form contracts and lack prolonged negotiations, personal visits and the like; or (b) that this is the manner in which Plaintiff deals with its record label customers.

### (g) Likelihood of Expansion

"A strong possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d at 354. Mr. Escamilla, the President of M2 Software, has testified that he is interested in developing web content in the rock, techno, metal, pop and jungle music genres. Pl.'s SGI ¶¶ 68–69. Plaintiff has not demonstrated that it intends to expand into Defendant's Christian music genre, nor that consumers believe that this is the case. Similarly, there is no evidence that Defendant intends (or that consumers believe that Defendant intends) to expand into music genres other than Christian music.

Plaintiff argues, citing Defendant's current "iWorship" multimedia offerings, that "consumers will perceive that Defendant will … expand into … interactive software offerings in an intersecting field." Pl.'s Opp. at 23. It is unclear what "intersecting field" Plaintiff is talking about. If Plaintiff means CD–ROM products, that categorization is too broad to be meaningful. Even if Defendant is likely to produce CD–ROM products in the future, there is no evidence that they would have anything other than a Christian theme, which is outside the realm of Plaintiff's CD–ROM products. If by "intersecting field" Plaintiff means royalty processing software applications, there is absolutely no evidence that Defendant intends—or that record industry consumers perceive that Defendant intends—to expand into this field. Contrary to Plaintiff's implication, that Integrity Media, Inc., Defendant's parent company, sells software, 5/29/03 Escamilla Decl. Exh. 7 at 36 (Integrity Media, Inc.'s 2002 10–K filing), says nothing about Defendant's likelihood of expansion.

### (h) Defendant's Intent in Selecting the Mark

■ "Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive." *Interstellar Starship Services, Ltd. v. Epix, Inc.*, 184 F.3d 1107, 1111 (9th Cir.1999) (citing *Brookfield*, 174 F.3d at 1059). Plaintiff argues that the constructive notice its trademark registration served is sufficient to infer such knowledge on Defendant's part. *See Id. But see* 3 *McCarthy* § 23:109 ("[T]he existence of constructive notice [of a plaintiff's registration] is not evidence that a later user necessarily intended to confuse."). However, even if intent must be presumed in this case, this factor "loses importance" where "due to weakness of the mark and differences in the marks and goods, there is no infringement." *Id.* § 23:107. This is so, because a Defendant's intent is irrelevant if it has not actually committed a wrong in the first place. *Id.* As discussed above, other than the similarity of the marks, nearly all of the *Sleekcraft* factors strongly favor the Defendant. Therefore, even if Defendant intended to capitalize on Plaintiff's goodwill, the Court finds that no reasonable jury could conclude that there is a likelihood of forward confusion between Plaintiff's products and services and Defendant's products. *See Brookfield*, 174 F.3d at 1059 ("[T]his [intent] factor is only relevant to the extent that it bears upon the likelihood that consumers will be confused by the alleged infringer's mark.").

The above analysis leads to the conclusion that no reasonable juror could con-

clude that members of the public generally or record industry consumers are likely to believe that there is an "affiliation, connection, or association" between Plaintiff's goods and services and Defendant's goods, or that Defendant's goods originate from, are sponsored by or are approved by Plaintiff. 15 U.S.C. § 1125(a)(1)(A). Accordingly, Defendant's Motion for Summary Adjudication on forward confusion is GRANTED and Plaintiff's Motion for Summary Adjudication on this same claim is DENIED.

## B. Likelihood of Reverse Confusion

■ "The question in [reverse confusion] cases is whether consumers doing business with the senior user might mistakenly believe that they are dealing with the junior user." *Walter,* 210 F.3d at 1110 (9th Cir.2000) (quoting *Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127, 1130 (9th Cir.1998)). When evaluating reverse confusion, the Court focuses on the strength of M2 Communications's mark, because "the greater the power of [M2 Communications's] mark in the marketplace, the more likely it is to capture the minds of [M2 Software's] customers." *Id.* at 1130 n. 5. Indeed, the Ninth Circuit has stated that reverse confusion occurs when "the smaller senior user . . . seeks to protect its business identity from being overwhelmed by a larger junior user who has saturated the market with publicity." *Cohn,* 281 F.3d at 841.

■ No reasonable jury could find reverse confusion in this case, because Plaintiff has provided no evidence that M2 Communications "saturated the market" with publicity. Plaintiff argues that upon encountering Plaintiff's music business products, a record label executive "may simply assume that [Defendant] has expanded into providing . . . record label management services." Pl.'s Reply at 5. However, this assertion does not establish that confusion is "probable, not simply a possibility," *Cohn,* 281 F.3d at 842, among "an appreciable number" of consumers. *Entrepreneur Media,* 279 F.3d at 1151. The evidence is that Defendant publicizes its products in the Christian music market by advertising in Christian publications, Christian music conferences and the like. There is no evidence that Defendant's marketing efforts are so extensive, in that area or any other area, that such efforts likely would cause a record industry professional to believe that Defendant has expanded into the royalty processing business. Similarly, there is no evidence that Defendant publicized its "M2.0" mark in the Christian music market to such an extent that a general Christian music consumer would believe that Defendant had expanded into the non-Christian music genres in which Plaintiff's CD–ROM products and website fall. *Compare Dreamwerks,* 142 F.3d at 1130 (Defendant DreamWorks SKG had a "famous mark" that "casts a long shadow."); *Cohn,* 281 F.3d at 839, 841 (Court found that "extensive advertising" by Defendant Petsmart, a national chain of pet supplies stores, "[gave] it the ability to overwhelm any public recognition and goodwill that Cohn [had] developed.").

## C. Defendant's Request for Attorneys' Fees

■ "The court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The Ninth Circuit has held that this requirement is satisfied when the suit is "groundless, unreasonable, vexatious, or pursued in bad faith." *Cairns v. Franklin Mint Co.,* 292 F.3d 1139, 1156 (9th Cir. 2002) (quoting *Avery Dennison Corp. v. Sumpton,* 189 F.3d 868, 881 (9th Cir. 1999)). The Court declines to award attorneys' fees in this case.

First, although Plaintiff's actions in this litigation have on occasion been misguided,

the Court cannot find with the requisite confidence that Plaintiff pursued this action in bad faith. Second, the Court does not find that Plaintiff's suit was wholly "groundless" or "unreasonable." This is not a situation where Plaintiff sued on an invalid trademark registration for a generic term and without admissible evidence for a good faith belief that infringement was occurring. *E.g. K–Jack Engineering Co. v. Pete's Newsrack, Inc.,* 209 U.S.P.Q. 386, 387 (C.D.Cal.1980). Nor is there evidence of an ulterior competitive motive. 5 *McCarthy* § 30:101 at 30–196 to 30–197.

Defendant argues that the Court ought to award attorneys' fees, because "Plaintiff blindly pursued this action while taking no steps to fulfill its burden." Dft.'s Reply at 21–22. Defendant notes that Plaintiff did not depose Defendant's managing agent and experts, chose not to conduct any third party discovery and did not conduct a survey regarding likelihood of confusion. First, Plaintiff *did* conduct a survey, albeit a poorly designed one and focused on another case, that included questions about Defendant's "M2.0" mark. 8/26/02 Madacy Mot. *in limine* No. 2 Exh. B–1 Q.8 (*Madacy* case). That the Court granted a motion *in limine* in that case to exclude the survey on the basis of its poor design does not warrant penalizing Plaintiff again by awarding attorneys' fees. Second, Plaintiff's discovery failures are partly the reason Plaintiff was unable to raise a genuine issue on these motions. That Plaintiff lost its case is a sufficient sanction for its sloppy discovery conduct.

### IV.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment[8] is GRANTED and Plaintiff's Motion for Summary Adjudication on the Issue of Likelihood of Confusion[9] is DENIED. Defendant's Motion for Summary Adjudication on the issue of Damages is MOOT.[10] Defendant's request for attorneys' fees is DENIED.

Defendant shall lodge a proposed Judgment consistent with this Order by not later than August 8, 2003.

IT IS SO ORDERED.

---

**8.** Docket No. 145.

**9.** Docket No. 150.

**10.** Docket No. 154.