**AMERICAN INTERNATIONAL REINSURANCE COMPANY, INC., Appellant,**

v.

**AIRCO, INC., Appellee.**

**Appeal No. 77–521.**

United States Court of Customs and Patent Appeals.

Feb. 23, 1978.

Rehearing Denied April 27, 1978.

Roy C. Hopgood, James M. Rhodes, Jr., Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, attorneys of record, for appellant.

W. Brown Morton, Jr., John T. Roberts, Morton, Sutherland & Roberts, Washington, D. C., attorneys of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Judges.

LANE, Judge.

This is an appeal from the decision of the Trademark Trial and Appeal Board (board) in opposition No. 56,735 denying appellant-opposer's (opposer) motion for summary judgment and granting appellee-applicant's (applicant) cross-motion for summary judgment. We affirm.

### Application Being Opposed

The application being opposed is application serial No. 25,457, filed June 27, 1974, alleging first use in commerce on May 1, 1935, for the mark AIRCO, for the service of "administering annuity plans for others."

### Applicant

Applicant was incorporated in New York in 1915 under the name of Air Reduction Company, Inc.; this continued to be its legal name until October 1, 1971, when it was changed to Airco, Inc. It has a diversified product line which includes, inter alia, industrial gases, gas welding and cutting equipment, medical gases and hospital equipment, and carbon and graphite products. Applicant has obtained 88 trademark registrations of AIRCO in various classes of goods and services.

### The Retirement Income Plan

In 1935, applicant adopted a Retirement Income Plan for its employees, which plan was described in a brochure which it distributed to its employees; the 1935 brochure prominently displayed the term AIRCO. The original plan, which was a voluntary contributory pension-annuity plan, was offered only to employees of applicant and of applicant's subsidiaries; subsequently, it has been expanded to also include employees of any affiliate of applicant. The details of the plan, and changes that have occurred since its adoption, are not relevant to the issues on appeal. Suffice it to say that participation in any of applicant's pension-annuity plans stems in every case from having been an active employee (or survivor) of applicant, or of a subsidiary or affiliate of applicant.

### The Services for which Applicant Seeks to Register the Mark AIRCO

The plans are administered by a pension committee, which committee consists of three members of applicant's board of directors. The pension committee has the power to make final, unappealable determinations of benefits due in the event of any conflict between a participant and the insurance company or trustee (applicant is not the actual insurer or trustee).

The Airco Pension Plans vest after a period; currently, there are 727 participants of the plan who are not now, but were once, Airco employees. Applicant maintains records on them and after they reach retirement age will direct the insurer to make annuity payments to them.

In 1970, Airco sold its Chemicals and Plastics Division. A part of the purchase agreement was that service with the purchaser counts for vesting under the Airco Pension Plan; applicant continues to maintain records of those persons and will, when they reach retirement age, direct annuity payments.

A major current responsibility of applicant relates to the annuitants who are presently receiving benefits. Each month the insurer prints and mails checks to these

annuitants from computer-based records; each month applicant sends to the insurer information to alter the monthly annuity payments. This information includes, inter alia, new annuitants, address changes, deceased annuitants, and payment of death benefits. This work is done under the supervision of the pension committee, and applicant has the sole responsibility for the accuracy of the foregoing information; the insurer's responsibility and authority is limited to making the changes and payments as instructed.

### Proceedings Below and the Board's Opinion

In its notice of opposition, opposer asserts, inter alia: that it is an insurance corporation formed in 1948 under the laws of Panama; that it has continuously used the acronym AIRCO in connection with its business, as well as using it to advertise in the U. S.; that companies in which it has a controlling interest, which do business in the U. S., have used the term AIRCO to show their relationship to opposer; that in connection with the services for which registration is sought, applicant's "in-house" use of the term AIRCO is not a "use in commerce" within the meaning of the Trademark Act (hereinafter referred to as "the Act"); and that if registration is permitted, likelihood of confusion will result. After taking extensive discovery, both parties moved for summary judgment.

The board viewed the issue of whether applicant performs a service within the meaning of the Act as an ex parte issue which cannot be raised in an opposition proceeding; it then concluded that since applicant's 1935 use date was unchallenged, and since opposer's earliest claimed use was 1948, applicant's rights are superior to opposer's. Therefore, it granted applicant's cross-motion for summary judgment and dismissed the opposition.

1. Section 45, 15 U.S.C. § 1127.

2. For a detailed discussion of the legislative history of the Act as it relates to the service

### OPINION

■ We believe the board erred in refusing to consider whether applicant performs a service within the meaning of the Act. This issue was inextricably entwined with the ground for opposition predicated on likelihood of confusion (the ground based on § 2(d) of the Act, 15 U.S.C. § 1052(d)) since it went to the priority of use inquiry.

While we would find it useful to have the board's view on this issue, the interest of judicial economy would be better served by not remanding to the board since: the facts as to the nature of the services are not in dispute; the issue is solely one of law; and both parties extensively addressed the issue in their briefs.

The dispositive issue, as briefed and argued by the parties, is whether the "administering of annuity plans for others," where the "others" is restricted to employees and ex-employees (and their surviving beneficiaries) of applicant, or of a subsidiary or affiliate of applicant, is capable of forming the basis of a service mark registration.

While the Act defines the term "service mark,"[1] it does not define the broad term "services." Similarly, the legislative history of the Act addresses the term "service mark" but sheds little light on what was intended to be meant by "services."[2] It would appear self-evident that no attempt was made to define "services" simply because of the plethora of services that the human mind is capable of conceiving. This, ipso facto, would suggest that the term be liberally construed. Cognizant of the foregoing statement, each case must be decided on its own facts, giving proper regard to judicial precedent.

■ Turning to the facts in the case at hand, applicant's principal business is the manufacturing of sundry products; in connection with its business, applicant offers to its employees (and the employees of its subsidiaries and affiliates) the services in question. The employees have the option of

mark provisions, see *Ex parte Procter & Gamble Co.,* 97 USPQ 78, 82–84 (P.O. Ex.-in-Chief 1953).

enrolling in applicant's contributory annuity-pension plan, and concomitantly, the option of receiving the services offered by applicant; if they elect to, the employees can go to the marketplace and select a different annuity plan, which plan would be administered by an entity other than applicant. The fact that the services in question are offered only to applicant's employees (and the employees of its subsidiaries and affiliates) is of no moment; the Act does not preclude registration simply because the services are offered only to a limited segment of the public (that the employees are, indeed, members of the public cannot be seriously questioned—being employed by applicant does not strip them of this status).

Opposer argues, however, that the Act does not abrogate the common law requirement that a service mark must be used in association with a trade or business to identify one's services and distinguish them from those of others; that the in-house clerical acts which applicant performs in connection with the pension-annuity plans it offers its own employees is not such a trade or business; and that these acts are merely part of applicant's operation of its own manufacturing business.

Assuming, arguendo, that such requirement is a sine qua non for federal registration, the fact that applicant manufactures products (a trade or business beyond peradventure) and, in connection therewith, renders the services in question, is sufficient to satisfy it. The fact that the services in question are not applicant's principal trade or business is immaterial; the Act makes no distinction between services on this basis. See 1 J. T. McCarthy, Trademarks and Unfair Competition ¶ 19.30, at 708–09 (1973).

Taking a somewhat different tack, opposer contends that the services offered by applicant are, in effect, fringe benefits, and, as such, are rendered merely as an accessory to its own employee recruiting effort and its own manufacturing business; relying on *Ex parte Armco Steel Corp.*, 102 USPQ 124 (Comm.Pat.1954), and *In re Johnson Publishing Co.*, 130 USPQ 185 (TTAB 1961), opposer, therefore, asserts that these services cannot form the basis of a service mark registration. In *Armco,* applicant was in the business of selling stainless steel products; in connection with its selling efforts, it offered to analyze the requirements of prospective customers (the service for which registration was sought). In *Johnson,* applicant sought service mark registration for a "puzzle contest," which contest was designed to promote the sale of applicant's magazine. The common thread underlying both of these cases is that the service rendered was not sufficiently separate from the sale of a product. In this regard, see also *In re Orion Research Inc.,* 523 F.2d 1398, 187 USPQ 485 (Cust. & Pat. App.1975). The services in the present case, in contradistinction to those in *Armco, Johnson,* and *Orion,* are totally separate from the sale of applicant's products—in point of fact, they are rendered to a segment of the public who, ostensibly, are not even the purchasers of applicant's products; therefore, opposer's reliance on these prior cases is misplaced.

Finally, opposer asserts that since an employee knows that the source of his fringe benefits is his employer, the mark in question cannot serve a service mark function. Presumably, the function opposer is referring to is that of origin indicating. We view this argument as without merit; the fact that an employee may know that the services are provided by his employer does not preclude the mark from functioning to indicate origin. Moreover, the services are also performed for beneficiaries of employees and ex-employees whose knowledge of applicant, absent the mark in question, would be far from certain.

In conclusion, we hold that the services in question are "services" within the meaning of the Act. Concomitantly, applicant, and not opposer, is the prior user. The decision of the board dismissing the opposition is *affirmed.*

*AFFIRMED.*

MILLER, Judge, dissenting.

I agree that the board erred in refusing to consider whether applicant performs a "service" within the meaning of the Trade-

mark Act; that, contrary to the board, the question "can properly be considered inter partes"; and that this goes to the question of which party was the prior user. Accordingly, the case should be remanded for the board's discussion and decision on the question.

Failing this, I am persuaded that applicant's "in house" clerical acts in processing "fringe benefit" annuity plans for its own employees (and for those of its subsidiaries and affiliates) and their surviving beneficiaries is not a "service" with respect to which service mark rights may vest. The majority's response that the Trademark Act makes no distinction on the basis that the services are not applicant's *principal* trade or business simply begs the question of whether the processing of such fringe benefit annuity plans is a "trade or business" for purposes of the Trademark Act.[1] The majority further begs the question by saying that the Trademark Act does not preclude registration simply because the services are offered only to a limited segment of the public. Applicant's employees (and the employees of its subsidiaries and affiliates) and their surviving beneficiaries do *not* constitute "a limited segment of the public" insofar as applicant is concerned.

When the Trademark Act was enacted, Congress was not concerned with the private employees of the owner of a mark. At the time the bill passed the House (H.R. 1654, 79th Cong., 1st Sess. (1945)) Congressman Lanham, himself, stated:

> Mr. Speaker, the purpose of the measure is to protect honest business and also to protect the purchasers of commodities so that they may know the origin of the goods they were buying.

91 Cong.Rec. (Part 2) 1724 (1945). This view was underscored by the Senate report accompanying the bill. The Committee on Patents stated its belief that the bill accomplished two purposes:

> One is to protect the *public* so it may be confident that, in purchasing a product

bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trademark has spent energy, time, and money in presenting to the *public* the product, he is protected in his investment from its misappropriation . . . . [Emphasis supplied.]

[1946] U.S.Code Cong. Service p. 1274.

Although the majority's statement that the term "services" in the Trademark Act should be liberally construed is correct, it stretches "liberalism" to the breaking point to fail to recognize the difference between public goodwill (which is protected by registration of a service mark) and goodwill among the private employees of the owner of the mark.

The majority's suggestion that applicant's mark functions "to indicate origin" (to its employees), even though "an employee may know that the services are provided by [applicant]" is self-contradictory. And it is pure conjecture for the majority to say that the knowledge of applicant on the part of ex-employees and the beneficiaries of employees "would be far from certain."

---

1. Such processing of applicant's annuity plans is, as the majority points out, "totally separate from the sale of applicant's products." The sale of goods clearly is a "trade or business" *insofar as the public is concerned*; whereas, the processing of applicant's annuity plans is not.