**In re CANADIAN PACIFIC LIMITED.**

**Appeal No. 84–1415.**

United States Court of Appeals,
Federal Circuit.

Feb. 14, 1985.

Roberts B. Larson, Larson & Taylor, Arlington, Va., for appellant. With him on the brief was Brewster B. Taylor, Arlington, Va.

Fred W. Sherling, Associate Sol., Dept. of Justice, Arlington, Va., for appellee. With him on the brief were Joseph F. Nakamura, Sol. and Jere W. Sears, Deputy Sol., Washington, D.C.

Before MARKEY, Chief Judge, and RICH and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

The decision of the Trademark Trial and Appeal Board (Board), 222 USPQ 533, affirming a refusal to register as service marks CANADIAN PACIFIC ENTERPRISES LIMITED, LES ENTREPRISES CANADIEN PACIFIQUE LIMITEE (both in special form of lettering), and a representation of nine geese in flight, as shown in Serial Nos. 280,023, 280,024 and 280,025, is affirmed.

## I.

Canadian Pacific Limited (Canadian Pacific) filed three substantially identical applications [1] to register their alleged service marks (Serial Nos. 280,023, 280,024, 280,-024, *supra*) on the Principal Register for:

Offering shares to the public which involve participation, whether by control or

substantial investment, in a portfolio of companies, mainly Canadian companies, with emphasis on the hotel, real estate, resources development and manufacturing industries, providing a shareholder dividend re-investment and share purchase plan; and preparing reports and the like on the progress of companies in the portfolio. [As amended.]

The examiner refused registration on the ground that the applicant was not performing a "service" within the meaning of Section 45 of the Trademark Act, 15 U.S.C. § 1127 (1976).[2]

Canadian Pacific is a well-known Canadian corporation having significant interests in railways, shipping, air transport, trucking, communications, and natural resources. Canadian Pacific Enterprises Limited (Enterprises), then a wholly owned subsidiary of Canadian Pacific,[3] was incorporated in 1962 under the laws of Canada "to acquire and develop the resources and other non-transportation interests of its parent." In addition to developing natural resources, real estate and hotel interests, Enterprises also owns an investment portfolio of marketable securities. In connection with its portfolio, Enterprises has established a "Shareholder Dividend Reinvestment and Share Purchase Plan" (Plan). The applications-to-register are made in connection with this Plan.

The Plan provides a voluntary and convenient means for all registered holders of common shares of Enterprises to reinvest their cash dividends and to make optional cash payments in new common shares of Enterprises. Only the registered holders of common shares of Enterprises may join

---

**1.** The marks *qua* marks and their display are not in issue.

**2.** The relevant portion of 15 U.S.C. § 1127, which speaks of "construction and definition", states:

The term 'service mark' means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others. Titles, character names and other distinctive features of

radio or television programs may be registered as service mark notwithstanding that they, or the programs, may advertise the goods of the sponsor.

**3.** Apparently, Canadian Pacific now owns some 75% of Enterprises' common stock, and we therefore assume that about 25% of Enterprises' shareholders are also owners of Canadian Pacific shares or are others who have acquired Enterprises' stock.

the Plan.[4] By way of support for the assertion that a valuable service is provided, appellant points out that the attendant benefits of the Plan include an automatic quarterly reinvestment, optional quarterly cash payments to be invested in new common shares, no brokerage fees, and regular quarterly statements or reports.

In affirming the refusal to register the applicant's alleged service marks, the Board stated that the activities outlined in the Plan are routine corporate activities no different from those engaged in by other public corporations, "*i.e.*, the offering of shares of stock to the public and to its shareholders, and preparing and distributing periodic reports to its shareholders." The activity applicant labels as a service is "merely accessory" to the initial offering of its own shares, and therefore, the Board reasoned, "not sufficiently separate from that routine corporate activity to constitute a registrable service."

## II.

This appeal raises a question of first impression in the elusive quest to find an appropriate definition of "services" under the Lanham Act. The Act defines "service mark," but fails to define "services." A further difficulty is that the legislative history reveals little bearing on the definition of "services." Our predecessor court has reasoned that "no attempt was made to define 'services' simply because of the plethora of services that the human mind is capable of conceiving." *American International Reinsurance Co. v. Airco, Inc.*, 570 F.2d 941, 943, 197 USPQ 69, 71 (CCPA), *cert. denied*, 439 U.S. 866, 99 S.Ct. 190, 58 L.Ed.2d 175 (1978). Under that principle, appellant points out, the statute is entitled to a liberal interpretation.

In the absence of persuasive reasons to the contrary, words in a statute are to be given their ordinary and common meaning. *Banks v. Chicago Grain Trimmers Assn., Inc.*, 390 U.S. 459, 465, 88

S.Ct. 1140, 20 L.Ed.2d 30, *reh. denied*, 391 U.S. 929, 88 S.Ct. 1800, 20 L.Ed.2d 671 (1968). Appellant states that the accepted dictionary definition of "services" is "the performance of labor for the benefit of *another*." (Citing Webster's Collegiate Dictionary (5th Ed.)) (emphasis added). We do not take exception to this definition. On the contrary, that definition is consistent with the Trademark Manual of Examining Procedure § 1301.01, which, in suggesting certain criteria for determining what constitutes a service, states that "a service must be performed to the order of or for the *benefit of others* than the applicant." (Emphasis added). Hence, our concern here lies in who is to be considered "other" or "another," consonant with the policies of trademark law.

When the Lanham Trademark Act was enacted, Congress was concerned with protecting the purchasers of a service or product. The Committee on Patents stated its belief that the Bill accomplished two purposes:

> One is to protect the *public* so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the *public* the product, he is protected in his investment from its misappropriation .... [Emphasis added.]

S.Rep. No. 1333, 79th Cong., 2d Sess. 3, *reprinted in* 1946 U.S.Code Cong.Service 1274. Thus, it is this goodwill, established in the minds of the relevant buying public, which is protected by the registration of a service mark. *See* 1 McCarthy, *Trademarks and Unfair Competition*, § 2.7 (2d ed. 1984). Since it is a segment of the public which "purchases" and "benefits" from a service provided by the owner of the mark, then it is from the viewpoint of a "public" to which we direct our inquiry.

**4.** Interestingly, the offering circular states that the common shares to be issued are not registered under this country's Securities Act of 1933, and therefore the Plan is not available to residents of the United States.

The question then becomes whether the shareholders under the Plan are to be considered as members of a "public" for purposes of registrability of these marks.

■ Because the Plan is available *only* to Enterprises' own stockholders in connection with their further investment or participation in Enterprises' own activities, we think that no person or entity "other" than Enterprises (and its 75% parent Canadian Pacific, which has made the applications) is at all involved, and therefore that there is no "public"—which by definition must consist of at least some group of the greater public that is separate from the applicant— to which (or to whom) the asserted service mark can be directed and be useful. Enterprises' shareholders are, in fact and in law, its owners, *i.e.*, all together they *are* Enterprises, and there is no other such owner.

In support of the contrary proposition that Enterprises' shareholders are the "other" in the definition of "services", and therefore members of a "public," appellant directs our attention to *American International Reinsurance Co. v. Airco, Inc., supra.* In that case, the applicant, whose principal business was the manufacture of sundry products, offered its *employees* a Retirement Income Plan. It was for this latter service that the applicant sought to register a service mark. In holding that such an activity constituted a "service" within the meaning of the Act, the CCPA stated that the "fact that the services in question are offered only to applicant's employees ... is of no moment; the Act does not preclude registration simply because the services are offered only to a limited segment of the public." 570 F.2d at 943, 197 USPQ at 71. The court added that being employed by the applicant did not strip the employees of their status as members of the public. Appellant contends that by analogy its shareholders are the same as employees, and therefore that its marks are registrable.

There are, however, important distinctions between *American International* and the current case. We must look closely at what is being offered here and to

whom it is being offered. The Plan sets out a system for reinvestment of dividends in new common shares of Enterprises available only to those persons who already have common shares of Enterprises. This is quite different from *American International* where the services were "rendered to a segment of the public who, ostensibly, (were) not even the purchaser's of applicants' products." 570 F.2d at 943, 197 USPQ at 71 (the consumers purchased the "sundry" products and the employees enrolled in the retirement plan). In this case, the only offerees of the service are shareholders who have already purchased or acquired Enterprises' stock. Thus, the subsequent services offered by the Plan are inseparably linked to the initial sale or acquisition of stock, and solely concerned with enlargement of that existing ownership. *Cf. In re Orion Research, Inc.*, 669 F.2d 689, 205 USPQ 688 (CCPA 1980) (repair/replacement activity in connection with the sale of applicant's product not a sufficiently separate service to merit registrability).

A further critical distinction between *American International* and this case is that, unlike an employee, a shareholder has the right to participate proportionately in all profits, management, and the distribution of net assets on liquidation. *Freese v. U.S.*, 323 F.Supp. 1194, 1197 (N.D.Okla. 1971), *aff'd*, 455 F.2d 1146 (10th Cir.), *cert. denied*, 409 U.S. 879, 93 S.Ct. 85, 34 L.Ed.2d 134 (1972). A shareholder has an ongoing, fractional, equitable and proprietary interest in the property and assets of a corporation. 11 *Fletcher Cyc. Corp.* § 5100 (Perm.Ed.). In a word, he or she is the owner of an undivided portion of the corporation. *Id.* It follows, of course, that *the* "owner" of a corporation is the body of shareholders as a whole.

Appellant says that reinvestment, which in turn increases capitalization, benefits the shareholder and not just the corporation. The answer is that in this particular respect shareholders and corporations are inseparably tied together. The Plan's offer to the shareholders, as a whole, to increase

their ownership in Enterprises is akin to an offer to *the* owner of the corporation, and thus is equivalent to an offer of a service to the corporation itself. The increased capitalization inures not only to the benefit of the corporate entity, but also to *all* the shareholders, who, as we have said, are the equitable owners of the corporation. Such a plan is analogous to a sole proprietor's, or a partnership's, offering a plan of reinvestment to himself or itself. There is no benefit or service conferred upon "another," and no benefit to be conferred on any member of the relevant buying "public." Instead, every service is rigidly limited to further ownership by the very family of owners of the marks sought to be registered.[5] The Lanham Act does not afford this kind of intramural or internal protection.[6]

Appellant has failed to convince us that its shareholders should be considered as members of the public, apart from appellant itself. Consequently, the Trademark Act does not apply to their activities, and we agree with the Board's decision that the applicant's marks are not registrable as service marks.

AFFIRMED.

---

5. Appellant proffers an analogy to investment of shares in a mutual fund, for the purpose of benefiting from the underlying securities in which the mutual fund places its money. There is some doubt whether this contention was properly made before the Board below, but in any event we see a marked difference in the two situations sought to be compared. Mutual funds try to interest the general investing public to participate in the fund, and thus to gain from the mutual fund's general activities. Appellant's Plan is restricted to its *existing* shareholders (*i.e.,* its existing owners) and provides them with help with respect to re-investment of their dividends and purchase of additional shares in Enterprises.

6. As the Board pointed out, the Congress that enacted the Lanham Act had a clear intention to draw a line between indicia which perform only trade *name* functions (identification of the business, vocation, or occupation) and indicia which also perform the function of service marks. Although appellant strongly denies that it seeks registration of its subsidiary's trade name, that would be the result here—if we held for appellant. A trade name, without any of the functions of a true service mark, would be registered.