THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: April 26, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*City National Bank*

*v.*

*OPGI Management GP Inc./Gestion OPGI Inc.*

_____

Cancellation No. 92050730
against Registration No. 3209863

_____

David W. Grace of Loeb & Loeb LLP for City National Bank.

Dickerson M. Downing of Crowell & Moring LLP for OPGI Management GP
Inc./Gestion OPGI Inc.

_____

Before Bucher, Wellington and Kuczma,
Administrative Trademark Judges.

Opinion by Wellington, Administrative Trademark Judge:

City National Bank (hereinafter "petitioner") filed a petition to cancel the registration of OPGI Management GP Inc./Gestion OPGI Inc. (a Canadian corporation and hereinafter "respondent") for the mark **TREASURYNET** in typed character format for services described as "providing information on financial information, namely corporate treasury and loan information and commercial real estate proper-

ty management information via a global computer network" in International Class 36.[1] The registration issued pursuant to Section 44(e) of the Trademark Act, based on a Canadian Registration, and, accordingly, proof of use of the mark in commerce in the United States was not required.

As grounds for cancellation, petitioner asserts that respondent, and its predecessor-in-interest, lacked the required *bona fide* intent to use the mark in commerce at the time of filing the underlying application for registration in the United States, and that respondent has abandoned the registered mark because it has not been used in commerce by respondent since registration.[2] Petitioner also asserts, with regard to its standing, that its own trademark applications have been refused registration by the Office on the basis of a likelihood of confusion with the subject registration.

Respondent, in its answer to the amended pleading, denied the salient allegations in the complaint.

The parties have filed trial briefs and a hearing was held on September 5, 2012.

---

[1] Registration No. 3209863 was issued on February 20, 2007. A declaration of use pursuant to Section 8 of the Act has not been filed; with the grace period, respondent has until August 20, 2013 to do so.

[2] Petitioner filed an amended petition for cancellation on August 2, 2010. In the amended pleading, petitioner pleaded a "fraudulent procurement of registration" ground for cancellation, as well as other allegations involving "no valid foreign registration" and "invalid assignment of intent to use application;" however, petitioner did not pursue any of these allegations at trial. Accordingly, any possible additional grounds for cancellation based on these assertions are considered to have been waived and have been given no further consideration.

<u>Evidentiary Objections</u>

Petitioner filed, concurrently with its trial brief, objections to the following evidentiary submissions of respondent: (1) excerpts from the Rule 30(b)(6) discovery deposition of respondent's witness, Mr. Gawain Smart; (2) a three-page Hewlett Packard document identified as a "brochure"; and (3) "all [trial] testimony by Mr. Smart concerning events prior to the date in 2008 when Mr. Smart's employment commenced."

### *Rule 30(b)(6) Deposition Counter-designations*

During its testimony period, petitioner submitted certain portions of the Rule 30(b)(6) discovery deposition that it took of respondent's witness, Mr. Gawain Smart. In response and during its own testimony period, respondent submitted additional passages from the same deposition; the parties have referred to respondent's submissions as "counter-designations." Normally a party may not rely on a Rule 30(b)(6) discovery deposition taken by the adverse party. See Trademark Rule 2.120(j)(1). However, Trademark Rule 2.120(j)(4) provides that "if only part of a discovery deposition is submitted and made part of the record by a party, an adverse party may introduce under a notice of reliance any other part of the deposition which should in fairness be considered so as to make not misleading what was offered by the submitting party."

Petitioner objected to all of respondent's proposed counter-designations. In response to these objections, respondent withdrew all but one of its proposed counter-designations. Brief, p. 3 ("[Respondent] believes that it has obtained the same in-

formation through the testimony of Mr. Smart that it sought to obtain through its challenged counter-designations and, therefore, it is not necessary to contest Petitioner's objections with one exception").[3]  Thus, the remaining relevant discovery deposition testimony (under questioning by petitioner's counsel) is as follows:

Q1.  When is the first time you saw [the TreasuryNet intranet site]?
A.  Well, the first time I saw the site is when I was employed.

Q2.  In 2008?
A.  In 2008.

Q3.  So do you know what it looked like at any time before that?
A.  I do not know.

Q4.  You do not know?
A.  I'm told though that the site provided the same level of information, perhaps less than it does today.

Q5.  Who told you?
A.  I had discussions with members of our Treasury group that are responsible for operating and maintaining the site.

Smart Dep. 23:13-24:4.

The first three questions and responses were submitted by petitioner, and filed under a notice of reliance, as testimony that it intends to rely upon at trial. The latter two questions and responses constitute the counter-designated testimony that respondent intends to rely upon.

---

[3]  The now-withdrawn, proposed counter-designations (Smart Discov. Dep. 10:6-11, 24:18-25:1, 73:23-25, and 75:1-6) are not further considered.

Petitioner argues the counter-designation exceeds the scope of petitioner's designated testimony, consists of hearsay, and deponent does not have personal knowledge to make such statements. Respondent argues that the counter-designation is an elaboration of Mr. Smart's initial two answers regarding his knowledge of the intranet site and thus is both "relevant and responsive." Respondent's Response to Objections, p. 4.

The counter-designation, namely, the last two questions and answers, clearly offer context and elaborate on Mr. Smart's responses to the initial three questions that petitioner is relying upon. In that respect, it meets the requirements of Trademark Rule 2.120(j)(4). As for the hearsay objection, to the extent that Mr. Smart's knowledge of the intranet site pre-2008 is not based on personal knowledge but is within respondent's realm of information, this is not entirely inappropriate because, as respondent's designated Rule 30(b)(6) witness, he is testifying on behalf of respondent and not himself. Rule 30(b)(6) provides that the party's designated witness shall "testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).[4] We therefore overrule the objection and respondent's counter-designation is allowed.

---

[4] Rule 30(b)(6) anticipates that a party's designated witness will not necessarily have personal knowledge of all matters but will nonetheless offer testimony regarding information that the "party" should be able to provide; indeed, one purpose of this rule is that it "will curb the 'bandying' by which officers or managing agents of a corporation are deposed in turn but each disclaims knowledge of facts that are clearly known to persons in the organization and thereby to it." See note to subdivision (b)(6), Fed. R. Civ. P. 30(b)(6). We further note that a party being deposed under Rule 30(b)(6) cannot use such testimony as a means to circumvent the hearsay exclusion rule. Such deposition is a discovery tool and, as de-

### *Hewlett Packard Brochure*

The document in question, as mentioned, consists of three pages and apparently was published by a third party, Hewlett-Packard Company (also called "HP"), and begins "HP and Notable Solutions, Inc. deliver a more efficient and cost-effective customer service infrastructure to Oxford Properties." At the end of the document is a copyright notice dated 2003.

In its notice of reliance, respondent states that this document is "available to the general public in libraries and/or of general circulation among members of the public through the Internet or that segment of the public which is relevant to the issues of this proceeding."

Petitioner has objected to the introduction of this document by way of notice of reliance because it "has not been authenticated by a competent witness and ... is not a 'printed publication' within the meaning of [Rule 2.122(e)]." Petitioner's objections, p. 4. Respondent, on the other hand, points out the document's copyright notice date and counters that it was downloaded via the internet. In its response to the objections, respondent provided a URL (internet address) where the document may be accessed along with printouts from the website. Respondent also cites to the Board's decision in *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031 (TTAB 2010), in support of its contention that the document is publicly available through the internet.

---

scribed above, any submission of testimony by the testifying party is strictly limited to that allowed under Rule 2.120(j)(4).

Trademark Rule 2.122(e) provides that printed publications and official records may be introduced in evidence by filing a notice of reliance. In *Safer*, the Board liberalized the practice and interpretation of Rule 2.122(e) by "expanding the types of documents that may be introduced by notice of reliance to include not only printed publications in general circulation, but also documents such as [printouts from] websites, advertising, *business publications* ... prepared for or by a party or non-party, if, and only if, they can be obtained through the Internet as publicly available documents." *Safer* at 1039 (emphasis in italics added).

We find that the three-page Hewlett Packard document in question is of the type that may be submitted by notice of reliance. It is clearly a business publication or brochure prepared by a third party. Furthermore, respondent has demonstrated, albeit in response to petitioner's objections, that the document may be readily accessed via the internet. Any shortcomings in respondent's original submission of the HP document under notice of reliance, such as its failure to identify the URL and when the document was actually accessed (either printed out or downloaded), are procedural deficiencies that were not timely raised by petitioner and thus have been waived.[5]

Accordingly, petitioner's objection to respondent's submission of the HP document is overruled.

---

[5] Specifically, respondent filed the notice of reliance on May 3, 2011, and petitioner did not file its objections until August 17, 2011. See TBMP Section 707.02(b) and cases cited therein regarding the waiver of procedural objections.

We hasten to add, however, that the HP document has limited probative value inasmuch as it is admissible solely for what it shows on its face. It cannot be considered to prove the truth of any matter stated therein. *See, e.g., 7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1717 n.2 (TTAB 2007) (materials made of record by notice of reliance under 37 C.F.R. § 2.122(e) not admissible for the truth of the matters contained therein, unless a competent witness has testified to the truth of such matters); *Midwest Plastic Fabricators Inc. v. Underwriters Laboratories Inc.*, 12 USPQ2d 1267, 1270 n.5 (TTAB 1989) (annual report in evidence only for what it showed on its face), *aff'd*, 906 F.2d 1568, 15 USPQ2d 1359 (Fed. Cir. 1990). Although Mr. Smart offered testimony concerning this document, as later discussed in this decision, his testimony does very little to expand the document's probative value to this proceeding.

### *Testimony of Mr. Smart (As to events prior to May 2008)*

Petitioner has objected to respondent's reliance on the trial testimony of Mr. Smart "as to any and all events occurring prior to 2008 when Mr. Smart's employment by [respondent] began." Petitioner's objections at 6. Petitioner contends that "[a]ny testimony by him about activities before 2008 is incompetent hearsay evidence admissible under no recognizable hearsay exception." Petitioner's reply at 4. In support, petitioner cites to the Board's decision in *American Express Company v. Darcon Travel Corporation*, 215 USPQ 529 (TTAB 1982). Throughout Mr. Smart's trial deposition, petitioner timely raised objections as to "lack of foundation" when Mr. Smart testified to matters involving respondent prior to May 2008.

Respondent argues that Mr. Smart has "sufficient reliable knowledge" and is capable of testifying to matters, including those prior to his employment, based on his "investigating this matter and discussing issues regarding intent and the like with the persons with the most knowledge of those issues and by reviewing relevant documents." Brief at 22.

Federal Rule of Evidence 602 provides that "[a] witness may not testify to matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." While there are exceptions to this hearsay exclusion rule, including the introduction of business records into evidence, the Board has held that a witness may not offer testimony regarding company history unless said witness has personal knowledge thereof:

> [T]he [business record hearsay exception] rule does not provide for the admission into evidence of the testimony of a person who lacks personal knowledge of the facts, who is unable to testify to the fulfillment of the conditions specified within the rule, and who is testifying only about what he has read or has been allowed to review.

*Olin Corporation v. Hydrotreat, Inc.*, 210 USPQ 63, 67 (TTAB 1981). *Cf., Kohler Co. v. Baldwin Hardware Corporation*, 82 USPQ2d 1100, 1103 (TTAB 2007) (petitioner's witness "began employment ... prior to the earliest date upon which respondent relies").

Respondent has not demonstrated that Mr. Smart has personal knowledge regarding respondent's history prior to May 2008 or its use of the term TREAS-URYNET prior to that date. Indeed, Mr. Smart testified that he worked for several law firms prior to May 2008 and he had no dealings with respondent or its affiliates

9

prior to his employment with respondent. Respondent acknowledges that Mr. Smart does not have personal knowledge about respondent's history prior to May 2008, and that he only learned about such matters through "discussions" and "investigat[ions]." Subsequent to being asked about events prior to 2008, Mr. Smart was asked about the "basis of [his] knowledge" and he replied, "[h]aving spoken to our former general counsel, as well as members of the treasury group and other people internally at the company."[6]

We acknowledge there may be some difficulty for a company involved in a trademark dispute to produce witnesses with personal knowledge of the company's use of its trademarks, especially if such use dates back many years. In certain cases, testimony by a person that his job responsibilities require him to be familiar with the activities of the company that occurred prior to his employment may be sufficient to lay a foundation for his subsequent testimony. However, this situation is not present here. Mr. Smart was testifying to matters pertaining to respondent that occurred between 2000 and May 2008. This is not ancient history given the trial in this matter took place in 2010-2011. Mr. Smart's testimony reveals that respondent could have produced a witness with the requisite personal knowledge of matters for those years, but respondent did not have this person testify, or provide any reason why he could not testify.[7] Moreover respondent has not shown that Mr. Smart's position, as respondent's in-house counsel, required him to have knowledge,

---

[6] Smart Tr. 22:3-8.

[7] Mr. Smart identified, by name, the head of respondent's "treasury group" as a person with knowledge of respondent's activities during the "early 2000's." Smart Tr. 60:16-19.

let alone knowledge of the particular details, of the matters for which he was testifying and which pre-dated his employment. For example, Mr. Smart offered testimony regarding the content and appearance of respondent's intranet site for the years preceding 2008, but it was not shown how this type of information would necessarily be obtained through the normal course of his employment as in-house counsel.

In sum, it has not been shown that Mr. Smart has sufficient personal knowledge regarding respondent and any use of the term TREASURYNET, prior to his employment in May 2008. Any testimony provided by Mr. Smart in this regard is based on discussions with respondent's former general counsel or other employees of respondent and clearly constitutes inadmissible hearsay. Respondent has not demonstrated that such testimony may be admitted through any possible exception to the hearsay exclusion rule. Mr. Smart also offered testimony regarding a document identified as a Thomson & Thomson search report for "TreasuryNet" over petitioner's objections due to "lack of foundation." While petitioner did not specifically object to the introduction of the search report itself, it did object to Mr. Smart's testimony regarding the exhibit because the search report was produced prior to Mr. Smart's employment and he stated that the basis for his knowledge of the report was discussions with other employees of respondent. Thus, the search report is of record and has been considered; however, for reasons already provided, Mr. Smart's testimony concerning the search report constitutes impermissible hearsay and is disregarded.

In view thereof, petitioner's objection is sustained and Mr. Smart's testimony concerning respondent and its activities prior to May 2008 has not been given further consideration. *See, Coach Services Inc. v. Triumph Learning LLC,* 96 UPSQ2d 1600, 1603 (TTAB 2010), *aff'd in relevant part,* 668 F.3d 1356, 101 USPQ2d 1713, 1730 (Fed. Cir. 2012) (Board sustained opposer's objection by limiting testimony from applicant's witness "only for purposes of authenticating documents kept by applicant in the ordinary course of business" and excluding testimony regarding events that pre-existed the witness' employment and for which the witness did not otherwise have personal knowledge).

The Record

The record, by operation of the rules, includes the pleadings and the file of the subject registration.

In addition, petitioner has submitted the testimony, with exhibits, of Mr. Steven Wildemuth, a Senior Vice President for petitioner.

In its initial and rebuttal testimony periods, petitioner filed several of notices of reliance on the following materials: copies of the file history for petitioner's trademark applications for the marks TREASURY NET[8] and CITY NATIONAL TREASURY NET[9]; copies of respondent's responses to petitioner's first set of document re-

---

[8] Application Serial No. 78225993.

[9] Application Serial No. 78225994.

quests[10] and first set of interrogatories; excerpts of the discovery deposition of Mr. Smart, as supplemented; copies of the file histories for applications and registrations currently or previously owned by respondent, obtained from the Trademark Office database; and copies from the Canadian CIPO trademark database involving applications and registrations currently or previously owned by respondent.

As previously noted, respondent filed a copy of the testimonial deposition of Mr. Smart and a notice of reliance. In accordance with petitioner's sustained objections, Mr. Smart's testimony is limited to testimony that does not involve respondent's history prior to May of 2008, and the only evidence considered of record by way of the notice of reliance is the HP document.

## Standing

Respondent has conceded petitioner's standing. Brief at 15. In any event, the record includes petitioner's applications in which the subject registration has been cited against registration of petitioner's marks and this demonstrates that petitioner is not a "mere intermeddler" and that it has standing to petition to cancel respondent's mark. *See Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *see also Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

---

[10] We note that petitioner submitted respondent's responses to the requests and not any produced documents. Responses are admissible solely for purposes of showing that a party has stated that there are no responsive documents; documents produced in response to the requests are generally not admissible by notice of reliance alone. Rule 2.120(j)(3)(ii); *see also* TBMP Section 704.11.

## The Grounds For Cancellation/Issues

Although the grounds for cancellation were pleaded to be abandonment (i.e., non-use plus lack of intent to resume use) and lack of a *bona fide* intent to use the mark in commerce, the underlying basis for both of petitioner's claims in this proceeding is that any use by respondent of the term TREASURYNET has thus far been solely for respondent's internal use, not for use by others, and thus the term was never used *in commerce* in connection with the services recited in the registration. Likewise, petitioner contends that respondent's predecessor-in-interest lacked the requisite *bona fide* intent to use the mark in commerce because the actual manner in which it intended to use (and later did use) the term TREASURYNET was, and is, not proper use *in commerce.*

As a result, a threshold issue in this proceeding is whether respondent's, or its predecessor-in-interest's, use of TREASURYNET constitutes use in commerce in connection with the recited services of providing information on financial information, namely corporate treasury and loan information and commercial real estate property management information via a global computer network. We note that the issue of how respondent is actually using the term TREASURYNET is not really in dispute; rather, the crux of the parties' disagreement involves the legal conclusions that should be drawn therefrom, *i.e.*, whether such use constitutes service mark use in commerce in connection with the recited services.

## Respondent and Its Use of TREASURYNET

Before addressing the merits of the grounds for cancellation, and necessarily the above-mentioned threshold issue in this proceeding, a brief discussion of the record and respondent's activities, with an emphasis on its manner of use of the term TREASURYNET, is in order. In this regard, we note that nearly all pertinent factual findings are based on the testimony of Mr. Smart inasmuch as he is the sole witness with personal knowledge of respondent's activities, at least since his employment began in May 2008.

Respondent is "part of the property management group of OMERS (the Ontario Municipal Employees Retirement System), a large pension fund headquartered in Ontario, Canada" and manages approximately US$65 billion in assets. Brief, p. 5, citing to Smart Tr. 6:13-20. Respondent manages approximately US$16 billion in property located in the United States for OMERS and has approximately 1,300 employees located in Canada, the United States and elsewhere. Respondent is also the successor-in-interest to the original registrant, Oxford Development Group, Inc., which was purchased by OMERS *circa* 2001.[11]

Respondent, in conducting its business, owns an intranet website whereby respondent's employees may access an informational database identified as "TreasuryNet." The database contains financial information concerning the various properties owned or co-owned by OMERS and/or managed by respondent. Mr. Smart has testified that "TreasuryNet is a service that's provided principally for third-party co-

---

[11] An assignment of "an undivided part of assignor's interest" in Registration No. 3209863 to respondent was recorded with the Office on November 21, 2002 (reel/frame 2624/0096), with an assignment execution date of October 15, 2001.

owners who own real estate with [respondent or OMERS], and it provides up-to-date cash management information on the inflows and outflows for each of our properties."[12] However, Mr. Smart also testified that third parties cannot directly access the information in the company's TREASURYNET database; rather, only respondent's employees have access to the intranet site and the TREASURYNET database. According to Mr. Smart, in order for third parties, such as property co-owners, to access any information from the TREASURYNET database, they would "speak to one of our property managers and they get a report that's generated based on TreasuryNet."[13] Again, the information obtained from the TREASURYNET database is "not available electronically [to third parties], although the information – reports can be generated from the site and made available to outside people."[14]

Respondent does not "advertise under the TreasuryNet mark."[15] There is no evidence that TREASURYNET was even identified or mentioned on respondent's external website prior to end of 2010,[16] or that third parties regard respondent's use of TREASURYNET as a service mark used in connection with the recited services. Indeed, under cross-examination, Mr. Smart testified that he has no personal knowledge of any third party using the term TREASURYNET in connection with respondent. Specifically, while Mr. Smart testified that he himself accesses the

---

[12] Smart Tr. 22:10-15.

[13] Smart Tr. 25:21-23.

[14] Smart Tr. 49:4-8.

[15] Smart Tr. 54:4-6.

[16] Mr. Smart testified that a "pop up box" use of the TREASURYNET term on its external website was added "in response to [the cancellation proceeding]." Smart Tr. 80:13-15.

TREASURYNET database on a fairly regular basis, he has no personal knowledge of third parties using the TREASURYNET term in requesting financial information services from respondent.

Mr. Smart offered testimony regarding the HP document. As previously discussed, this document was submitted via notice of reliance and, over petitioner's objections, allowed to be introduced for what it shows on its face. Mr. Smart has characterized this document as evidence showing TREASURYNET being "used on third-party advertising."[17] However, under cross-examination, he testified that this was the only "third-party advertisement" that he is aware of that mentions TREASURYNET.[18] Furthermore, based on Mr. Smart's testimony, it is clear that he knows nothing about this document other than what it shows on its face. He could not state with certainty how or where the HP document was accessed, whether it was placed in a magazine, or the number of copies published, if any, or any other information relevant to the issue at hand.[19] Ultimately, Mr. Smart conceded that "other than … it was publicly available, I don't know anything about it."[20] Even when asked for his basis for stating it was "publicly available," he seemed unsure and offered "I believe my attorney did a search and found it on the internet."[21]

---

[17] Smart Tr. 55:18-20, Exhibit 13.

[18] *Id.* at 90:13.

[19] *Id.* at 90-91.

[20] *Id.* at 91:5-7.

[21] *Id.* at 91:10-11.

Upon review of the Hewlett Packard document, and allowing for all reasonable inferences that may be gleaned therefrom, we do not view this as evidence of respondent's use of the term TREASURYNET as a service mark or even as a reference to any services being rendered by respondent under the same term. Rather, the document appears to be an advertisement or press release issued by HP touting its ability (and that of an additional company) in assisting respondent through a pilot program to improve the TREASURYNET database software and create a less-paper-oriented environment. While the article refers to "[t]he testimony of the users involved in the TreasuryNet pilot," we construe this as a reference to users of the database involved in the pilot program and not actual customers of any services rendered by respondent.

<u>Whether Respondent's Use of TREASURYNET<br>Constitutes Use in Commerce</u>

Based on the aforementioned facts, and indeed the entire record, we find that respondent has not demonstrated that it has ever used TREASURYNET as a mark in commerce in connection with the recited services. Rather, the evidence shows that respondent's use of TREASURYNET, since at least May 2008, is solely for internal purposes and not in any manner which can be construed as use in commerce in connection with the recited services rendered to others.

"Use in commerce" is defined, in pertinent part, in Section 45 of the Act as:

> [T]he *bona fide* use of a mark in the ordinary course of trade, and not made merely to reserve a right in a mark.  For purposes of this chapter, a mark shall be deemed to be in use in commerce--

18

> ... on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127.

Respondent contends that "there is no question" that it "provides tangible services directly to its employees under the TREASURYNET mark." Brief at 31. Respondent argues that such services are "real and tangible and range from information services regarding [respondent's] various properties and financial information to links to other sites where employees can obtain information about market conditions and the like." *Id*. Respondent cites to an article from THE TRADEMARK REPORTER and several cases to support its position that such exclusive internal use of a mark may constitute use in commerce.

Respondent's contention that its provision of the TREASURYNET database via its intranet site to its employees constitutes services in commerce, as contemplated by the Lanham Act, is not well taken because the primary beneficiary is respondent itself. Nearly all authorities that have addressed the issue of whether an entity's internal use of a proposed mark constitutes use in commerce for registration purposes have acknowledged that the primary beneficiary of any services provided under the mark should be individuals or entities other than the party rendering the services. To wit, in the same article from THE TRADEMARK REPORTER referenced by respondent, the author points out that registration may be refused because "[a] service performed by the applicant for itself is not considered a service." Krizman, Lisa

K., *But It's For Internal Use Only! A Guide for Trademark Counsel*, 91 TMR 964, 970 (2001), referencing what is now Section 1301.01(a) of the Trademark Manual of Examining Procedure (TMEP). The current, relevant section of the TMEP elaborates:

> To be a service, an activity must be primarily for the benefit of someone other than the applicant. ... [A] company that sets up a personnel department to employ workers for itself is merely facilitating the conduct of its own business, while a company whose business is to recruit and place workers for other companies is performing employment agency services.
>
> The controlling question is who *primarily* benefits from the activity for which registration [of the mark] is sought. ... if the activity primarily benefits applicant, it is not a registrable service even if others derive an incidental benefit. *In re Dr. Pepper Co.*, 836 F.2d 508, 5 USPQ2d 1207 (Fed. Cir. 1987) (contest promoting applicant's goods not a registrable service, even though benefits accrue to winners of contest); *In re Alaska Northwest Publishing Co.*, 212 USPQ 316 (TTAB 1981).

TMEP Section 1301.01(a)(ii) (October 2012).

Moreover, the cases cited by respondent are not persuasive because they are based on substantially different circumstances from those in this proceeding. For example, in *Am. Int'l Reinsurance Co. v. Airco, Inc.*, 570 F.2d 941, 197 USPQ 69, 71 (CCPA 1978), the predecessor of our primary reviewing court found the applicant therein, a manufacturer of sundry products, was rendering a service in commerce and acquired trademark rights by using its mark in connection with administering an annuity pension plan on behalf of its employees. The court pointedly noted that the employees had the option to use the employer's services or they could "go to the marketplace and select a different annuity plan." The *Airco* employee, in other words, was personally the recipient and the primary beneficiary of a retirement

20

pension benefit service and had the option of receiving the same or similar service from a different company. In contrast, respondent herein is the real beneficiary and not its employees who are accessing the TREASURYNET database in order to perform their jobs. Respondent also cited to the decision in *Huthwaite, Inc. v. Sunrise Assisted Living, Inc.*, 261 F. Supp.2d 502, 66 USPQ2d 1902 (E.D. Va. 2003), which may be distinguished based on the nature of the claims as well as the facts. In *Huthwaite*, the district court found on summary judgment in a trademark infringement action that an in-house sales training program constituted a service, as contemplated by the Lanham Act, because:

> First, there is no doubt that Sunrise's employees received a presumably valuable benefit from the training; they learned the SPIN Selling method. The purpose of the training program was to improve their performance as salespeople, and any such improvement would almost certainly redound to the individual salesperson's benefit, whether in the form of a higher salary, higher commissions, a promotion, or simply greater job security. Furthermore, employees leaving Sunrise are able to take their SPIN Selling training experience with them, and Huthwaite provided evidence suggesting that this may well be a valuable, marketable credential. This factor is especially relevant given the high turnover among the Sunrise sales staff. Thus, although Sunrise's primary purpose in offering the sales training was surely to increase the performance of its sales staff and thereby improve its bottom line, rather than to provide a perk for its employees, the fact that training provided the employees with a valuable benefit is sufficient to satisfy the "for the benefit of another" test. *See Morningside* 182 F.3d at 138.

66 USPQ2d at 1912.

Petitioner has raised issues concerning the applicability of the court's approach in *Huthwaite* to this matter because the court was determining "use in commerce" in the context of a trademark infringement action versus the "use in commerce" re-

quired for purposes of registration. Even putting this distinction aside, we find that the facts of this proceeding are different and respondent's use of TREASURYNET does not rise to the level of "use in commerce" contemplated under the more lenient *Huthwaite* approach. Respondent's employees are not being offered a benefit and otherwise taught skills that are transferrable to other positions outside of their employment with respondent. Rather, respondent's employees are merely using respondent's proprietary database as a source of information in performing their work; they would not have access to this database upon leaving their job with respondent. The record in this proceeding provides no indication how respondent's employees would personally benefit from having access to the TREASURYNET database other than the satisfaction of knowing that they are fulfilling their employment duties on behalf of respondent.

To the extent respondent's argument is that third-party co-owners, and not just its own employees, are the intended consumers, there are no facts to support a finding that respondent has used the term TREASURYNET in connection with any services recited in the registration with respect to these co-owners. Again, respondent does not advertise its ability to provide information under the TREASURYNET mark and only respondent's employees can access the TREASURYNET database. Furthermore, based on Mr. Smart's description, TREASURYNET is merely the name of a database or tool utilized by its employees to access information and said information may be passed on to co-owners of respondent's properties. There is no evidence showing that the co-owners are even aware of the TREASURYNET data-

22

base. Finally, the "financial information services" as recited in the subject registration are described as being rendered "via a global computer network" whereas respondent, by its own admission, only provides TREASURYNET database-derived information "manually" in reports to the co-owners of properties.[22] In other words, the co-owners would not be acquiring the information directly from a global computer network.

With the above in mind, we now address the abandonment ground for cancellation.

Abandonment

The Trademark Act provides for the cancellation of a registration if the registered mark has been abandoned. *See* Section 14 of the Trademark Act, 15 U.S.C. § 1064. Under Section 45 of the Trademark Act, 15 U.S.C. § 1127, a mark is considered abandoned when "its use has been discontinued with intent not to resume such use." The definition of abandonment is found in this provision, as follows:

> A mark shall be deemed to be "abandoned" if either of the following occurs:

>> (1) When its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be *prima facie* evidence of abandonment. "Use" of a mark means the *bona fide* use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

> ...

*See* 15 U.S.C. §1127.

---

[22] Smart Tr. 85:13-16.

23

A presumption of abandonment based on three years nonuse may be invoked against a Section 44(e) registrant who never begins use of the mark or who discontinues using the mark. *Saddlesprings, Inc. v. Mad Croc Brands, Inc.*, 104 USPQ2d 1948 (TTAB 2012). *See also, Imperial Tobacco Ltd. v. Philip Morris Inc.*, 899 F.2d 1575, 14 USPQ2d 1390, 1395 (Fed. Cir. 1990).

Because registrations are presumed valid under the law, the party seeking to cancel a registration on the ground of abandonment must rebut this presumption by a preponderance of the evidence. *See On-Line Careline Inc. v. America Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000); and *Cerveceria Centroamericana S.A. v. Cerveceria India Inc.*, 892 F.2d 1021, 13 USPQ2d 1307 (Fed. Cir. 1989). If petitioner makes a *prima facie* case of abandonment, the burden of production, *i.e.*, going forward, then shifts to the registration holder to rebut the *prima facie* showing with evidence. *Id.*

Based on the entire record, including the discussed findings of fact and conclusion that respondent has not used TREASURYNET as a mark in commerce in connection with the recited services, we necessarily find that respondent has abandoned its mark. Specifically, respondent has not used TREASURYNET in commerce in connection with the recited services since at least the date of issuance of the registration, February 20, 2007, resulting in over three years of nonuse. Thus the record more than supports a *prima facie* case of abandonment and respondent has not rebutted this showing.

24

Even assuming, *arguendo*, that we were to extend respondent's current activities and its use of TREASURYNET as dating back to 2000 – and we do not do so because the record does not support this – we would reach the same conclusion as to abandonment. That is, because we find that respondent's use of TREASURYNET since 2007 does not constitute use in commerce in connection with the recited services, then logically any previous use of TREASURYNET by respondent (e.g., 2000 to 2007) cannot establish use in commerce subsequent to 2007. Similarly, our exclusion for hearsay reasons of Mr. Smart's testimony regarding respondent's activity prior to his employment is not determinative on the ultimate outcome of this proceeding. Mr. Smart's testimony regarding pre-2008 activities would only serve to confirm that respondent has used the term TREASURYNET in the identical, non-service mark manner for many more years. Thus, allowing his testimony would only establish an even longer period of non-use as a service mark.

**Decision**: The petition to cancel on the ground of abandonment is granted, and Registration No. 3209863 will be cancelled in due course.[23]

---

[23] Because we find that respondent has abandoned its mark and the registration is cancelled on this ground, we need not, and do not, reach the second ground involving an alleged lack of *bona fide* intent to use the applied-for mark at the time of filing the underlying application for registration in the United States.